Marc Douglass Duncan Estate
**Robert James Duncan, Executor & Attorney *Propria Persona***
PO Box 393/603 S. Main Street
Joseph, OR 97846
Tel: 541-432-0103
<u>sherryn136@yahoo.com</u>

**ROBERT DUNCAN (EXECUTOR) CURRENTLY ACTING AS ATTORNEY *PRO PER* DURING ON-GOING INVESTIGATIONS**

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PENDLETON DIVISION

The Estate of Marc Douglass Duncan, &
Robert J. Duncan, Executor and Father of the Deceased,

        Plaintiffs,

v.

**Part One:**
The Wallowa County Sheriff's Department, a county law enforcement agency; the Wallowa County District Attorney's Office, a county government agency; THE OREGON DEPARTMENT OF HUMAN SERVICES, a government agency; THE OREGON DEPARTMENT OF ADMINISTRATIVESERVICES, a government agency; Shelley A. Goodman (mother of the deceased), in her individual capacity; and Jane and John Does 1-13, in their individual and/or official capacities.

        Defendants

**Part Two:**
LEIGH BEDNAR, in her individual capacity; THERESA FISHER, in her individual capacity; MANDY DECKER, in her individual capacity; SHELLEY A. GOODMAN, in her individual capacity; WALLOWA COUNTY YOUTH SERVICES, a county government agency; THE OREGON DEPARTMENT OF HUMAN SERVICES, a state government agency; THE OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES, a government agency; and Jane and John Does 1-13, in their individual and/or official capacities.

        Defendants

CASE NO. 2:19-cv-02017-SU

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1- COMPLAINT AND DEMAND FOR JURY TRIAL


86725

Plaintiffs allege that at all times relevant and material:

* * *

# PARTIES

## Plaintiffs

1.  Marc Douglass Duncan was a 24 year-old gay male, and son of Robert J. Duncan and Shelley A. Goodman. He died on December 16, 2017, from injection by his mother's oxycodone (overdose) at her residence at 304 W. Alder Street #1, Joseph, OR 97846. Suicide was not a factor. His death was either an accidental overdose or a homicide. There were several red flags at the scene. Marc is survived by his mother, father, a half-brother Rob Duncan & his wife Melissa, a half- sister Andrea & her husband Ryan, and another half- brother Michael Linehan-Goodman & his wife Heather Linehan.

2.  Robert Duncan is the father of Marc Duncan and resides at 603 S. Main Street/ PO Box 393 Joseph, Oregon, 97846, with his wife and Marc's step-mother Sherry K. Duncan.

## Defendants

3.  Defendants: there were unknown numbers of Wallowa County Sheriff's deputies on duty in the early morning hours of the day of Marc's death. SGT. Neil Rogers was the investigating officer and wrote the incident report (#S2017204) but it is not clear if he was one of the officers on duty during that shift. He is no relation to Sheriff Steve Rogers. The identities of the officers (deputies) on duty and the nature of these officers involvement remain unknown to Plaintiffs, but will become known as formal discovery progresses.

4.  Defendant, Mona K. Williams was the District Attorney when the incident involving Marc's death occurred and later Defendant, Rebecca Frolander, Deputy DA, took over the DA position full-time, around June 2, 2018, when Williams was being vetted and then appointed by Governor Kate Brown as temporary replacement judge for the judge's seat vacated by retiring Judge West of the 10th Circuit Court of Oregon. Mona Williams lost that seat in the November election of 2018, which was won by now Judge Wes Williams from LaGrande, OR.

5.  Defendant, the Oregon Department of Human Services ("DHS"), was the central government agency that was in charge of the "Consumer-Employed Provider Program" (CEPP) (aka the "the home healthcare giver program") in Wallowa County at the time of

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

Marc's death in **Part One** of this complaint. DHS is responsible for the delivery and administration of state and federal Medicaid programs relating to at-home healthcare services (as opposed to nursing home services). Homecare workers (employees) are mandated to report any abuse to DHS involving consumer recipients and/or any people with mental conditions such as drug addiction to DHS. Qualifications of workers are determined (i.e. defined) by the Oregon Home Care Commission (OHCC) who provides a registry of job applicant to consumers. In **Part II** of this complaint , DHS was the government agency  responsible for the delivery and administration of state and federal programs relating to child welfare and child protective services (under CPS), when Marc was 16 just years-old. That will be addressed in **Part II** of this complaint.

6. Defendant, the Department of Administrative Services (DAS), is the central administrative agency of Oregon state government which sets and monitors "high standards" of accountability for state agencies and their various officials.

7.  Defendant, Leigh Bednar was the caseworker for Marc Duncan when then 16year-old  Marc Duncan was put in the custody of Child Protective Services (CPS) - now known as Child Welfare. She has since been either fired or resigned (forcedly or voluntarily) from CPS. The exact course of events that led up to Bednar's leaving and/or dismissal are not entirely clear to Plaintiffs at this time but are believed to be for her illegal actions in Marc's case and possibly others. The entire nature of Bednar's actions and the nature of her involvement in Marc's addiction issues that followed and eventual death remain unknown to Plaintiffs but will become known as formal discovery progresses

8.  Defendant, Theresa Fisher was the CPA local branch director and Leigh Bednar's supervisor at CPA in August of 2010 thru the end of Marc's Case in June of 2011. She is no longer with Child Welfare at the DHS in Enterprise. It is unknown to Plaintiffs if Fisher was fired' retired or resigned along with Bednar or was transferred as a result of her actions and mishandling of Marc's case as well as others. The entire nature of Fisher's involvement/complicity in Marc's case is unknown at this time but will be known as formal discovery progresses.

Robert J. Duncan
PO Box 393
Joseph, OR  97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

9. Defendant, Mandy Decker, was Marc's probation officer (PO) starting in early 2009 after Marc's father –Robert Duncan- turned him into the Wallowa County Sheriff's Department for having possession of a bag of his mother's prescription opioids. At that time her employer was known locally as the "Wallowa County Juvenile Department"; it is now called Wallowa County Department of Youth Services. Decker is now the Director of Youth Services with the retirement of former director John Lawrence.

10. Defendant, Wallowa County Department of Youth Services is overseen by the Wallowa County Board of Commissioners and is "committed to a balanced approach to Juvenile Justice". This balance involves four essential elements: (a) Public Safety, (b) Accountability, (c) Skill Building, and (d) Reducing Recidivism. That was true in 2009 as it is today.

11. Defendant, Shelley A. Goodman was Marc Duncan's biological mother, and has complicity in Marc's death. She is -by all accounts- known locally as a drug addict/dealer with mental problems and has a long criminal record of giving/selling drugs to teenagers as well as others. She admitted in family court in 2005, at a custody hearing, that she routinely gave methadone to her oldest son Michael. She also has been incarcerated for giving methadone to local teens, one of which nearly died.

12. Defendants Jane or John Doe 3-13 are the DHS caseworkers, caseworker supervisors, certifiers, certification supervisors, child protective services workers, child protective services supervisors, directors, officers, managers, Wallowa County Sheriff's Office deputies and supervisors, Wallowa County District Attorneys, DHS/OHCC homecare workers, DHS healthcare giver supervisors, DHS healthcare caseworkers and their supervisors and/or other agents and entities, that abetted acquiesced, aided, conspired and/or engaged in the alleged constitutional deprivations, statutory violations and torts. Their true identities and the nature of their involvement remain largely unknown to Plaintiffs, but will become known as formal discovery progresses.

13. In the course of their respective agency, employment, and partnership/

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

relationships with DHS, the Wallowa County Sheriff's Office, the Wallowa County District Attorney's Office, and/or the Wallowa County Department of Youth Services, All Defendants including Does acted jointly and severally, and for on behalf of each other.

\* \* \*

## JURISDICTION

### PART 1

14. The Court has jurisdiction in **Part 1** of this civil action under Title 28 USC §§1343(a)(1),(2),(3),(4), as this action arises under the Civil Rights Act, 42 USC§1983, §1885(3), §1986 and §1988; USC § Title 21 Controlled Substance Act Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970; USC Title 18 Crimes and Criminal Procedure § (2),(3,)(4), §1505, §1510 and possibly §1512 (3); Chapter 13 §241 and §242. The Court also has jurisdiction under 28 USC § 1331, 28 USC §§ 2201(a) and 2202, and supplemental jurisdiction under 28 USC §1367(a)

### Part 2

15. The Court has jurisdiction in **Part 2** of this civil action under Title 28 USC §1343(a)(1)(2)(3),(4), as this action arises under the Civil Rights Act, 42 USC § 1983, §1985, and §1988; the Child Abuse Prevention and Treatment Act of 1980(CAPTA), P.L.93-247, 88 Stat. 4, and as amended by 98 P.L. 457, 98 Stat. 1749; and in part, 28 USC § 1332; the Adoption Assistance and Child Welfare Act of 1980 (CAPTA, P.L. 96-272,94 Stat.502 (15). The Court also has jurisdiction under 28 USC § 1331, 28 USC §§ 2201(a) and 2202, and supplemental jurisdiction under 28 USC § 1367(a).

\* \* \*

## BACKGROUND & FACTUAL ALLEGATIONS

### PART 1

Robert J Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

16. The Oregon State 9-1-1 Program was established in 1981 by ORS 403. Program has adopted OARs 104, Division 80, an Emergency Communications System Program that ensuring uniform, prompt and efficient access to public and private safety services for the citizens of, and visitors to, the State of Oregon. Oregon is home to forty-three  9-1-1 centers known as Public Safety Answering Points (PSAP) that cover all 36 counties within the State.

17.  The PSAP for Wallowa County is the Wallowa County Sheriff's Office (WCSO) located at The Wallowa County Justice Center, 104 Greenwood Street, Enterprise OR  97828.

18. On December 16, 2017 at 3:30am, a 9-1-1 ground line call was received at the Wallowa County PSAP from the phone of Shelley Goodman according to their caller ID. The GPS location was determined to  be from  her  residence at 304 W. Alder Street  #1, in the neighboring city of Joseph. The call was from a screaming woman.

19. Earlier at 3:20am on December 16, 2017, a 9-1-1 phone call was received at the Wallowa County PSAP dispatch from a female resident at the Pineview  Apartments at 304 W. Alder Street in Joseph, OR, who heard a woman in the area yelling at someone to" leave her alone". The caller was not able to determine where the yelling was coming from before that yelling stopped (page 3 of **WCSO Incident Report: S2017204**), filed by Sergeant Neil Rogers, a deputy sheriff and investigating officer. It is not entirely clear from the report if Sgt. Rogers was on duty at 3:20am or came on duty at a later shift. **Note:** It is worth noting here that Neil Rogers is not related to Sheriff Steve Rogers.

20. On page 5 of the WCSO incident report, the ME told the officer(s) that "Marc most likely overdosed on narcotics". The death appeared to have been around "0300hour (3:00am)", 12/16/17 according to the incident report. **There was never any follow up investigation done by the WCSO even though Goodman's account of events was disjointed and confusing.** She was upset and had overmedicated on some unknown drug.

21. The ME report (**SME case Wallowa #17-4822**) described Goodman as a "very poor and confused historian and very upset". The ME (Dr. Lowell Euhus) did take

Robert J. Duncan
PO Box 393
Joseph, OR  97846
phone: 641-432 -0103
email: sherryn135@yahoo.com

the time to do some follow-up investigation and interviewed several local authorities that had knowledge of both Marc and his mother. According to District Attorney Williams, Deputy Rogers and Sprigg-Flanders (**note:** Paul S-F is an LPC fromMental Health), Goodman and her son Marc are very well known by law officers and the mental clinic system. They have been known addicts and unstable mentally apparently. The ME report further says that Goodman's story was very disjointed and forgettable" (page 3/first page of narrative, first paragraph). The ME did not go back to re-interview Goodman when she was sober as that would have fallen under the duties of the WCSO. Note: the ME is very well known/respected in this community as being very thorough.

22. According to the WCSO incident report "History Log of Calls", (page 7 of the Incident Report), Dr. Euhus was called at 6:45am from WCSO dispatch; he arrived at the Goodman residence at 7:11am according to the ME report. The time of death for Marc on the ME report was listed as 6:00am which is different than what the WCSO Incident Report states by 2-1/2 hours.

23. The WCS deputies did not respond to the 3:20am call from the Pineview Apartments because the caller could not identify where the disturbance was coming from at the complex.

24. Robert Duncan, Marc's father, arrived at the scene around 7:50am after being called there by Virginia Lucid (according to his caller ID), a neighbor of Goodman's. He expected an ambulance to be there when he arrived less than two minutes later. Duncan did not know his son Marc had expired until he got there; Lucid's phone call only said "Marc has overdosed and you need to get down here now"!

25. Duncan was disturbed about a few things he had seen in Marc's bedroom when he got down there. He thought about it all night and had his oldest son- Rob- call Sheriff Steve Rogers the following morning to report the unusual evidence he saw in order to preserve evidence. The Sheriff said he had spoken with Deputy Sgt. Neil Rogers who reported everything looked to be a standard overdose case; he added that Marc had track marks on his arm and they found one of his mother's oxycodone bottles in his bed. Robert Duncan told the deputies at the scene that Goodman has

Robert J. Duncan
PO Box 393
Joseph, OR 97848
phone: 541-432-0103
email: sherryn136@yahoo.com

Munchausen and he has known it for many years. He told them that three times and asked them after the third time if they knew what that meant. One said "yes" and the other said "no" but they seemed unconcerned.

26. Robert Duncan had a few questions for the Sheriff and called him a few days later. The Sheriff told him to direct any and all questions to Deputy Neil Rogers - the "investigating officer". Duncan told Sheriff Rogers about what DHS and Mandy Decker- the PO from Youth Services- had done to him in 2010; how CPS had "screwed up royally" and trampled all over his civil rights as sole custodial parent by placing Marc at risk at his mother's. Duncan also told the sheriff that he was going to do his own investigation and try to gather all the evidence from DHS, Mental Health, and Youth Service that he could. The conversation was cordial and Sheriff Steve - who seemed sympathetic -said "I understand. Hey, go for it"!

27. Duncan began his investigation right away and it would extend throughout the rest of 2018 and most of 2019. He first went down to talk with Goodman. He took his neighbor –Laurie Hamilton- as a witness. Goodman was not home so he knocked on her neighbor's –Virginia Lucid's- door to get information about Shelley's whereabouts. Duncan asked if they could come in and talk for a bit and Lucid was okay with that. Lucid told him that Shelley had literally come crawling to her door in the cold at about 6:30am, barefoot and in her night gown; she had locked herself out of her apartment and she thought Marc was dead. Lucid said she immediately called 9-I-1 from her apartment and the WCSO soon arrived (note: it would take about 10 minutes to drive from the WCSO headquarters in Enterprise to Goodman's residence in Joseph at normal legal speed). Lucid also said that Goodman was to be gone for some time after that for shoulder surgery.

28. Just after the New Year in early 2018, Duncan –again along with Hamilton- went down to Goodman's residence to retrieve some of Marc's things which Goodman and Duncan agreed were to be sold to cover some of the cremation expenses. Duncan had bought all of those things for Marc in the past and, of course, he alone would be paying for Marc's final expenses. In Marc's room there were over 20 insulin-type needles, many scattered pills, many of Goodman's empty prescription pill bottles and other drug paraphernalia… everywhere. Hamilton got badly stuck

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

with a hidden needle and she later went down to the ER at the hospital that same evening. By chance, Goodman was there with her neighbor -Bobbi McDaniel. Hamilton overheard Goodman asking the nurse for painkiller drugs for her shoulder.

29. Because of Hamilton's injury, Duncan tried to find out if there was a sample of Marc's blood that could be tested for pathogens. As it turned out- there was only one sample taken and that sample was at the Bollman Funeral Home. Unfortunately, the sample had not been stored properly and was useless for testing. Some police work!

30. Duncan's investigation became extremely difficult- emotionally- after all the letdowns, but he tried to keep moving forward; it seemed all doors were closed for finding answers. He still had no notion anything was seriously wrong with the WCSO investigation but still, things just didn't seem to add up. Sheriff Rogers had told Duncan they had to wait for three months after the incident report was filed at the District Attorney's Office before they could get a copy. They called Deputy Neil Rogers several times to inquire about the progress of the report –as well as other questions- but he was never there and did not return their voice mail requests to contact them.

31. On April 18, 2018, Duncan made a written request to the DA's office for a copy of the WCSO incident report and they said it was available. The woman at the front desk told his wife Sherry that they would have to pay only a small copying fee. DA Mona Williams then sent a letter dated 4-19-18 notifying the Duncans that would have to pay attorney fees, copy fees, and a labor charge for the secretarial labor, and she would send an estimate of expenses after they redacted the report. The letter also said the report was available and would take around 14 days to process. Duncan saw the "unknown attorney fees" as a threat of possible great expense and a thinly veiled attempt to discourage them from wanting the report (i.e. it would be very expensive) so he talked to Goodman and she spoke to the DA's office the next day and requested a copy of the report.

32. At first, the clerk at the DA's office told Goodman that it would be free for her because she was on disability. Goodman then sent a request letter for the incident report on 4-23-18 and got the exact same letter as Duncan did, only signed by

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

Rebecca Frolander, Deputy DA; it said the report was available and it would take approximately 14 days to redact and prepare. Both parties (Duncan and Goodman) should have gotten the report around the first week of May.

33. Also on April 18, 2019, after their visit to the DA's office (at around 11:00am), the Duncan's went down to the WCSO to see if he could get ambulance records from the last few months. Shelley Goodman had told Robert over the phone that she had taken 64 oxycodone on one occasion and 116 on another after Marc died, trying to kill herself; that seemed improbable to Robert that anyone could survive that large of dosage -even with a naloxone (the antidote for opioid overdose that works instantly) treatment- and/or any other medical treatments; a discussion later with a local doctor confirmed that to be true. Goodman was lying of course. While at the WCSO, Deputy Sharyn Newell came out and told Duncan that they could not release ambulance records because of HIPPA laws. Duncan asked to see Deputy Rogers and Newell said he would be on duty at 1:00pm. She wrote out a note for him to call Robert at home and said she would put it on his desk. Robert gave her their home phone number and told her they would be home all afternoon waiting for a call; Sgt. Rogers never called.

34. Around that time, the Duncan also ordered the **State Medical Examiners Report (Wallowa #17-4822)**, which is dated May 4, 2018. It was a few weeks before Robert could emotionally look at it but when he did there were a few things that caught his attention. On the first page of the narrative the ME says: **"An interesting call was received by Wallowa County dispatcher about 3:30am, on 12/16/17, with someone screaming and then suddenly stopped. Later review showed that this apparently came from Shelley's number but she had no memory of that".** That seemed odd to Duncan and raised more suspicion that things were not quite right. He finally decided that probably the ambulance had been there before he arrived at the scene and -because Marc had already died - EMTs left his body there for the funeral home to pick up.

35. Throughout the following months, Duncan contacted every government agency involved in this matter. He went down to Mental Health and made a request for Marc's records, but was denied because of HIPPA regulations. He was, however,

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sharryn136@yahoo.com

able to get Marc's medical records from Winding Waters Clinic (they were very cooperative) and it took only a few weeks to get them. Robert wrote to DHS in LaGrande on February 5, 2018, asking for Marc's CPS records. After a lengthy wait, he finally called the local CPS and they apologized saying that the paralegal had been on vacation; it took 5 months before he got a copy of the original report and although the written report hadn't changed from 2011, it gave DHS plenty of time to destroy or alter the digital/computer records -which they are well known for doing (i.e. DHS is noted for altering or destroying computer/digital data after the fact and doing other dirty tricks to protect themselves).

36. Duncan wrote to Youth Services for Marc's Juvenile records and they at first accepted his request but then later denied it based on some obscure law which protects the privacy of people like Marc who have had their juvenile criminal record expunged by the courts. Robert wrote back and told the County Attorney that he agreed with the principal of the statute except Marc did not need their "protection" anymore. Under the color of the law, they were protecting Mandy Decker, Marc's PO, who –arguably- set in motion a series of mistakes by the local bureaucracy that ultimately led to Marc's addiction problems and final demise.

37. Weeks passed by, then months, with no word from the DA's office about the Status of the WCSO incident report. Three more written requests for the report were made during that time with no reply from the DA's office; they had gone silent. It caused tremendous anxiety/depression/physical illness for both Duncan's, especially Robert. The Duncans finally got the report on July 17th, 2018, eight months after Marc's death. There was only 15 minutes of attorney time charged which begged the question "why did this take so long delay when they said 14 days?"  Duncan believes their intent was to obstruct, delay and protect the WCSO.

38. Before the Duncans ever got the WCSO Incident Report, they were already suspicious that the DA was trying to cover-up something because of the inexplicable delays and their silence when further written requests were made. In late Spring of 2018, Duncan talked to Goodman's about any 9-1-1 calls that she might have made the day Marc died; he didn't disclose the one mentioned in the ME report.  By that time, she seemed more clear-headed than when they had spoken earlier;

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn156@yahoo.com

Goodman claimed she had been off of drugs for several months by then and that appeared to be the case. Shelley claimed that she made <u>over ten 9-1-1 calls</u> that early morning when she found Marc in distress and "swore on her mother's grave" she was being truthful; she added that she was trying to do CPR and make calls all at the same time **Note:** Shelley is a gifted liar so Robert just tucked that bit of information away; Goodman can make up elaborate tales (lies) at the drop of a hat which is part of her mental problems. Later she called Duncan and said she wanted to come clean for all the horrific things she had done to him over the years that led up to Marc's death, mostly involving her lying to authorities. She gave a statement and later filed a legal declaration for the court in late June. She said it was to prevent eternal damnation of her soul and clear Duncan of any complicity in Marc's death.

39. On July 17th, 2018, the Duncans finally got the WCSO incident report. When Robert read the WCSO incident report, his worst suspicions about what happened in the early morning hours of Marc's death were confirmed. **The 3:30am, 9-1-1 call from Shelley Goodman was omitted from the phone log history,** and the way it was obliterated (clipped out) made it obvious!  Also, **the WCSO report said Marc died around 0300 hours while the ME report gave the time of death at 6:00am. The WCSO did not respond to Goodman's 9-1-1 call and Marc was left to die ;** an elaborate cover-up followed. The DA's office intentionally delayed the report to help the WCSO further hide what deputies had done/not done. There was suddenly a conspiracy to deny Robert his civil rights as Marc's father and to cover-up the violation of Marc's civil right to receive emergency medical attention. There was falsifying of a police report, obstruction of justice, spoliation of evidence, corruption, and other crimes committed as well. It was all done under the color of the law. Both 42USC§1983, and USC§1985, allow liability claims and suit against the WCSO and the DA's office for their obstruction of justice and depriving a person of rights or privileges.

40. It is apparent that both DA's knew well before they released the WCSO investigation report, that the report had some problems. Then they decided to help the WSCO cover things up; there was a conspiracy to cover-up mistakes made by the WCSO and a conspiracy to deny Robert his civil rights as Marc's father; that is


Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

also the very definition of corruption. In addition, WCSO had illegally falsified a police report, there was spoliation of evidence and there was obstruction of justice that occurred. The DA's office knew what WCSO had done and, therefore, is complicit in every way under Title 18 USC § (2)(3)(4), §1505, §1510, and Title 42 USC §1985. All of this cover-up/conspiracy was done under the color of the law.

41. Not too long later after finally getting the WCSO Incident Report on July 17th, of 2018, Duncan called the apartment assistant manager -Bobbi McDaniel –a "thru the wall neighbor" of Goodman's who shares a lone duplex with Goodman. She said she knew nothing and had slept thru the entire episode until 8:30am. Robert told her the Incident Report said "a woman helped to let Shelley back into her apartment and there was no discussion about Marc during the time she was there". McDaniel was assistant manager of the complex doubt and would have been the only person there with a key who could have let Shelley back into her apartment. Marc had told me a few years before he died that his mother shared her drugs with McDaniel –and others; Bobbi drove her many places since Goodman didn't have a vehicle. To McDaniel's credit, however, Marc also said she was the only "good person" that hung around Shelley's apartment.

42. The WCSO Incident Report, goes on to say that someone had heard a woman screaming outside of her apartment at about 3:30am. She (the name is redacted) looked out and saw that it was (name redacted). She went out to see what was going on. The woman outside was delirious and over medicated. The woman -name redacted (obviously Shelley) - told her she had knocked on Marc's window and he didn't wake up to let her in. When I read again that sentence in the report to McDaniel, she again denied any knowledge of that and said Shelley must have been hallucinating. McDaniel probably lied to me again; I can only guess as to why.

43. Unless it was Goodman's "drug buddy"- Sherry- (she was there at Shelley's apartment when Duncan arrived) that let Goodman into her apartment somehow - by say crawling thru an unlocked window- then it had to have been McDaniel that opened up the apartment with a key The names in that part of the WCSO incident report is carefully redacted. If it was "Crazy Sherry" that got Shelley back into the

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

apartment, then she could also have been someone that had a motive to harm Marc (i.e. retaliation for him taking her share of Shelley's drugs)! The WCSO deputies disqualified themselves from further investigation when they didn't respond to the 3:30am, 9-1-19-1-1 call; they wanted to end their investigation as quickly as possible. That is shameful. Duncan is a huge supporter of law enforcement and our military so this entire episode has been very disappointing to him.

44. Shelley Goodman was raised in a dysfunctional household with an alcoholic/drug addicted mother and an on/off father that spent 12 years in San Quinten Prison in California. She left home at 14 years-old and immediately got into the "drug scene". There are scars on her arms that Duncan believes are from self-mutilation (cutting) and she has admitted to him that she has attempted suicide on several occasions. Shelley never went to high school but tells people she has an MA degree in Counseling from UC Berkley; she even has a fake diploma. Goodman finally did get a GED after divorce/custody proceedings began in Siskiyou County, California, in 1996. She had at least two marriages before Duncan (both to imprisoned convicts) but never "legally" divorced either one. Duncan did not know that until he had Goodman investigated. Shelley also has bi-polar disorder, PTSD, and sexual dysfunction. Goodman further suffers from chronic gout that she can control with lemon juice/vinegar- as well as avoiding certain foods high in nitrates- but rather chooses opioids as treatment. She was morbidly obese for years but is now anorexic. Shelley also has borderline personality disorder. She is a narcissist as well as a sociopath with many psychopathic tendencies. Shelley is extremely charismatic -especially to teenagers and elderly women- which makes her a danger in the illicit drug circles. Goodman has a lengthy, mostly drug related, criminal record.

45. Goodman routinely lies to doctors to get painkillers, sympathy, and unnecessary treatments, and to social workers to get benefits. Goodman originally got her SSI in California, for MS, but that was all feigned; there were no definitive tests for MS back then and a medical diagnosis was based on a person's complaints to doctors about the symptoms. That was all undone in 1996 when Duncan turned her in for embezzlement/fraud in California. Authorities took away all of Goodman's California benefits; she embezzled over $75,000, yet never served jail time. After countless

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone 541- 432 -0103
email: sherryn136@yahoo.com

hours of research and discussions with doctors and psychologists, Duncan has determined she has a bizarre -but not uncommon- form of depression called adult Munchausen (aka *factitious disorder*) that sometimes morphs into Munchausen *by proxy* where they do things to their children and/or spouses. Goodman's mother also knew about Shelley's mental disorder(s) as did the father of her oldest son Michael. Interestingly, Marc had also actually figured this out about his mother several years before he died while he was studying/researching psychiatry on-line. Lying to doctors is not illegal as far as plaintiff can determine.

46. So, the combined liability of the WCSO deputies', the Wallowa County DA's Office, the Oregon DHS, and Shelley Goodman is either **gross negligence or worse (i.e. wrongful death)**, and falls under ORS § 30.020- the Oregon Wrongful Death Statute, (amended by 1961c.344§102;1973 c.718§1; 2003c.14§16). Plaintiffs may maintain action for injury under ORS 30.10, 2017 IRS 30.220, 2017 ORS 30.0702017 ORS30.030, 2017 ORS 31.600, 2017 ORS 31.610 and/or ORS 12.115. The WCSO dispatch handles 9-1-1calls in Wallowa County and deputies precede an ambulance during medical emergencies. Because the WCSO is such an intricate part of the first response team working on behalf of Wallowa Memorial Hospital and in conjunction with the other EMS (Emergency Medical Services), there actions may also have been violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), which is usually reserved only for obligations involving hospitals. WCSO deputies may have also violated ORS §165.570 (2015), by falsifying the **History Log of Call** (pp. 7-8 of the **WCSO Incident Report # S2017204)**.

47. The matter was **referred to the FBI** several months after Duncan wrote to the US Attorney for the District of Oregon -Billy Williams- (in August of 2019) after the Oregon Department of Justice did nothing and delayed investigative matters for at least nine months. The DOJ office finally decided that jurisdiction in this matter is at the local level. That became problematic because the DA's office became involved in the cover-up. As of this writing, the DA's office has not taken administrative action against the WCSO, even though they have known about this for over a year (i.e. torts were filed in late August and early September of 2018).

Robert J. Duncan
PO Box 382
Joseph, OR 97846
phone: 541- 432 -0103
email: sherrym150@yehoo.com

48. Deputy Neil Rogers is still working for the WCSO but may not be the individual at fault. That will be determined by the FBI thru investigation and by plaintiffs as discovery progresses. The DA attorneys are under investigation by both the Oregon State Bar (OSB) and the FBI. There is ample evidence that both the WCSO and the Wallowa County DA's Office have acted out of **consciousness of guilt** and conspired together to cover-up. Those crimes would fall under USC Title 18 Crimes and would include USC chapter 13, §241and §242, and fall under **"color of law"** as defined in the Civil Rights Act. Abuse of power under color of state law falls under 313 USC §§299,326 (1941).

49. To reiterate what happened, the WCSO knew they had messed up badly and later there then became a conspiracy between the WCSO and the DA's office to cover it all up. They apparently did not know that the ME had done more investigation work than they expected (i.e. more than they had done), and that Duncan knew about the ME report. Obviously, the WCSO either hadn't read the ME report or were -at least- hoping that the Duncan's would not get a copy of the ME report; finally they hung themselves!  Whether, Goodman made one 9-1-1 call or perhaps many, can be brought forth as the discovery process progresses. At any rate, one call should have been enough, especially when you're also trying to do CPR on someone at the same time.

50. The sad irony in this entire incident is that the WSCO officers carry **naloxone** – an over the counter nasal mist drug- that can reverse the effects of opioid overdose immediately when sprayed into the victims nostril(s). It's so safe, effective and easy to use that it is sold over the counter at pharmacies. Police officers everywhere carry it routinely and if any of the WCSO deputies had responded, Marc could have been saved by them before an ambulance even arrived.

51. **Liability of the DHS:** When Duncan arrived at the scene (Goodman's apartment) at 7:50am on 12-16-17. Goodman and another neighbor were frantically leaving the apartment. He recognized her as a woman named Sherry (sp.).

52. In the summer of 2017, Marc called Robert and was upset because his mother had overdosed and the ambulance was there. He thought his mother was going to

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

die. Duncan went down there at his son's request and -as he arrived- the EMTs were taking Goodman out on a gurney; she appeared to be unconscious. There was a foul-mouthed, crazed woman at the scene that was running around frantically and shouting obscenities to an extent Duncan had never heard coming from a woman's mouth. Marc told his father later that she was a "crazy, violent, drug addict" friend of Shelley's named Sherry (sp.), and was hired by DHS as Goodman's caregiver, but never showed up for work duties. Marc said "Sherry and his mother shared drugs". "Crazy Sherry" would leave town for weeks at a time, yet expected to be paid for doing absolutely nothing. Marc thought Sherry and Shelley had a scheme to share Sherry's paycheck in a fraud (i.e. embezzlement) arrangement. Duncan told Marc to let DHS handle things as Sherry might retaliate if he got involved. This left Duncan with the impression that DHS was not acting responsibly in their screening/vetting process of homecare workers.

53. When asked by his father (Robert Duncan), if he (Marc) was involved in any of this opioid activity, Marc denied using any of Shelley's prescription drugs and only confessed to the use of marijuana. Several years earlier, Marc had admitted to Robert and his step-mother (Sherry Duncan) that when he turned seventeen -after running away from home- he used methamphetamine for about a year until his "source" at the Pineview apartment complex moved away. The damage to Marc's teeth was clearly visible and Marc had no choice but to finally confess that. Robert and his wife began saving money to get his teeth fixed with dental implants so he could smile again in public and go on with his life.

54. Previously, in mid- fall of 2017, Marc had also told Robert that the healthcare giver before "Crazy Sherry" had quit because of all the drug activity surrounding his mother's place and Goodman's excessive addiction problems. That worker was named Dana (don't know last name) and Marc said she was a "good worker".

55. Dana became friends with Shelley. Marc said Dana and her boyfriend even had Thanksgiving dinner at Goodman's after she started work there. Dana later took a job at the DHS facility in Enterprise after Marc's death. Robert knows that because he saw her distinctive, bright orange, Dodge car parked along the highway every

Robert J. Duncan
PO Box 393
Joseph, OR. 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

time that he passed by DHS. Now that car is no longer parked there and it is uncertain what Dana's situation is now. It's important because she should have reported any drug abuse that was going on at Shelley's; it is mandated that homecare workers do so. This can hopefully be determined by plaintiff as the right of discovery progresses.

56. Duncan was called by Goodman the third week of October of 2019, and he asked Shelley if any of her past caregivers knew about the drug activities before Marc died and she said "of course they did". A few weeks later, while researching DHS literature concerning the Client-Employed Provider Program (CEPP), it became evident that there were possible violations; homecare workers (HCWs) are required to report such things to DHS and law enforcement. Oregon provides for cross-reporting of illegal drug activities and related information between DHS and law enforcement but both have chosen to overlook (i.e. refused to acknowledge) such activities at Shelley Goodman's residence apparently for years now. Dana and –perhaps- others HCWs probably knew about the dangerous drug situation (i.e. abuse) that went on at Goodman's residence and did nothing. The extent of these facts will hopefully be determined as the process of discovery progresses.

57. More research by Duncan followed that lead; he discovered that **Chapter 8: Preventing abuse and being a mandatory reporter** of **The Homecare Worker Guide, Consumer-Employed Provider Program** (CEPP program), page 39, says that "homecare workers (HCWs) are mandated to report abuse involving mental health conditions, even though it may be difficult to report abuse of someone you know such as a family member". The chapter goes on to describe one possible sign of abuse is "someone is hiding (using) the patients medications". Marc was doing just that; Shelley was allowing it; HCWs and DHS did not report any of this to law enforcement. Unlawful possession of oxycodone is a Class A misdemeanor, (2017 ORS 475.834), and unlawful delivery of oxycodone is a Class B felony (2017 ORS 475.830). Marc and his mother were also verbally and physically abusing each other while Shelley was dangerously overdosing. DHS did nothing to stop any of this. This is the major basis for Duncan's claim against DHS in **Part 1** of this complaint and part of his complaint against Shelley Goodman. This arrangement was also a

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn156@yahoo.com

violation of ORS 475.834(1)(2), ORS 475.752(1b), and ORS 475.840. **DHS is also mandated by law as a matter of individual and community protection to report these types of abuses to law enforcement.**

58.  Ironically, Marc was apparently hired after Dana and "Crazy Sherry" to be the next homecare worker for Shelley Goodman just before his death. So, there were two known addicts – the HCW Sherry and her client Shelley- followed by two in-house addicts (i.e. Shelley and Marc living together), all fighting over opioids as well as other drugs, and DHS did nothing to stop this; plus an addict -Shelley Goodman- was choosing her own HCWs. This situation- which was allowed by DHS and their CEPP program begs the question "what    could possibly do wrong with this scenario"?

59. On numerous occasions, DHS has been sued by individual citizens in federal and state courts alleging deliberate indifference, recklessness, and negligence in connection with the agencies historical failures to properly certify/recertify its' foster care providers to properly monitor the safety of foster children and timely act upon signs of child abuse and maintain appropriate professional boundaries with its foster care providers (i.e. enmeshment). DHS paid money to resolve many of these claims and compensate victims. Apparently, the Oregon DHS is following a similar path with its' CEP program and the HCWs.

60. Drug addiction is considered a mental disorder by the **Diagnostic and Statistical Manual of Mental Disorders, 4th Edition** and lists opioid and methamphetamine addictions as substance related disorders, (4.9) and (4.2) respectively. Obviously, Goodman's drug abuse history and crimes suggests that she requires a higher level of care other than the CEP program such as a State mental hospital or a state prison facility. Her abuse of her prescription opioids   will continue to be an ever present danger to the community just as it did in the past. How many more must die before this madness is stopped? DHS has chosen to ignore Goodman's on-going criminal abuse of her opioid prescriptions. Marc might be alive today if all of the drug abuse at Goodman's residence had been stopped by DHS, their HCWs under the CEPP, and law enforcement years earlier.

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

61. Before he died, Marc confessed to Sherry and his father that he had made a "Big Mistake" going to his mother's to live and apologized for all of the lies he had told. The most outstanding lie was that his father called him a "fag". Marc asked his father how he felt about that and Robert replied that "We were devastated by that and we have been scared "shitless" for your safety and welfare ever since". Marc said he wanted to move back home; he had had enough of his mother and she was a "monster". He went on to say that lately, she was taking some weird drugs and was doing some bizarre, bent- over, walking around movements; she couldn't sleep and her speech was barely comprehensible.

62. A few  weeks before he died, Marc told both Robert and Sherry  that  he  had "told his mother he was moving out and she was threatening suicide". His father told him he shouldn't have warned Shelley beforehand that he was leaving; rather he should have just left because she can be dangerous when overdosing, especially when on strange drugs.  For many years, Robert was afraid she would harm Marc because of her mental problems (i.e. Munchausen). Duncan's wife Sherry had also warned Marc that "his mother might harm him, even kill him, and that it was foolish of him to tell her". Less than a week later and 15 days before he was scheduled to move out, Marc was dead.

63. The night before Marc died, his dad went down to see if he was okay. The two always did  things  together  on  Fridays  and Robert  wanted  to give Marc an extra birthday pie that Sherry had made just for him (Robert's birthday was on Thursday December 14th). Robert had left a phone message Friday morning and had made several more calls later throughout the day; they only produced busy signals. Robert always would tap on Marc's bedroom window when he picked him up for work, and he hadn't been in Shelley's apartment since 2007. Marc's bedroom light was on and his door was closed; he couldn't see Marc and window tapping produced no results. He decided to go to the front door and in doing so he could see Shelley thru her bedroom window; she was in the hallway, bent over at the waist, walking in very tight circles and mumbling; she was obviously overdosed; this wasn't opioid overdose and Duncan had never seen her this way before. Marc had told Robert and Sherry about Shelley's new drug behavior a few weeks earlier and there it was. Robert went

Robert J. Duncan
PO Box 393
Joseph, OR  97846
phone: 541- 432 -0103
email: sharryn136@yahoo.com

a few feet more and knocked on the front door. It took several loud knocks and several minutes for Goodman to come to the door which was only about 15 feet away from her. She opened it and mumbled "Oh, hi Bob".  Robert asked for Marc and she said she did not know where he was. Robert asked several more times and she finally said he was at the grocery store bringing home a tall chair. That made no sense at all. (note: Robert could barely understand her words they were so garbled). Robert closed her door and started to walk away but then turned around and blew right thru the front door and right past Goodman who was still walking in tight, bent over circles in the living room and mumbling incoherently.

64. Robert then proceeded down the hall to Marc's room and knocked several times on the door. There was no response, so he opened the door and Marc was in bed sleeping. Duncan called Marc's name several times and he finally woke up, spoke, then moved to the foot of the bed only a few feet away from his father. Robert told him he was worried and had called all day.  Marc seemed quite lucid and said he was sick. After a short conversation Marc said "I'll call you in the morning Dad". Those were the last words Duncan would ever hear from his son. The call he got in the morning was not from Marc. Duncan told that story to the WCSO deputies the following morning because it was significant. He also told them Shelley has Munchausen which should have set off alarm bells. But because they had made such a huge mistake by not responding to the 3:30am 9-1-1 call from Shelley's phone, they did no further investigation. The only part of Duncan's story that was put in the investigation report was "Duncan saw Marc at 7:00pm on the previous night (i.e. the 15th ). The investigation report also said Goodman said she was out after midnight with friends. Duncan knew that would have not been possible so he asked Goodman if that was true when he finally got the police report back months later. Shelley said "she was too overdosed that night to be out with friends and the cops were lying". The entire WCSO investigation and what followed was a muddled mess.

65. Finally, inconsistent with its stated mission to set and monitor high standards of accountability for state agencies and officials, DAS, acting in concert with DHS and in coordination with law enforcement agencies, failed to complete their "sham investigation" in 2018, and determine legal responsibility, forcing Plaintiff(s) to bring

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

this civil action.

* * *

## PART 2 – February 9th 2009- September 7th 20011

66. Although the statutes of limitations for this part of this claim may have seemingly run out, there still may be action for **negligent injury and/or wrongful death** by DHS, CPS, DAS Youth Services for their illegal, flagrant acts in late August 2010 by CPS, under 2017 ORS§30.020 and 2017 ORS§12.115 (1), when Marc was still 16.

67. The actions of Child Welfare (aka CPS) under Oregon DHS and the Wallowa County Department of Youth Services (then called WC Juvenile Services or aka locally "Juvenile") were served tort claims against them in late August of 2018, for putting Marc in danger by placing him at his mother's in 2010, and then running a fake investigation of his father for 10 months for accusations that were never clear. They also denied Robert a hearing during those 10 months and therefore violated his civil rights as sole custodial parent. It was all done under the color of the law. Both the CPS case worker and her supervisor –Leigh Bednar and Theresa Fisher respectively- were later fired for what they did to Robert and others.

68. Although all of the Defendants were served timely, courtesy tort claims by late August thru early September of 2018, none of them have not opened any real investigations as far as Plaintiffs can determine.

69. In February of 2009, Robert Duncan discovered a bag of prescription opioids that his son Marc Duncan -then 15 years old- had apparently stolen from his mother or was given to him by his mother Shelley Goodman. That weekend Marc went to his mother's for a scheduled visitation and the bag had fallen out of his coat pocket. He had not seen her regularly for a while because she said "she was having a medical procedure and had to be in the hospital for a lengthy stay". It was later determined Goodman had been serving a short sentence in prison for giving opioids to a young man who nearly died. Robert *Googled* the numbers on the pills and they came up as OxyContin.

70. Marc came home early Sunday evening, after his scheduled visitation at his

Robert J Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

mother's residence at 304 W. Alder Street #1, in Joseph Oregon. He was acting seemingly drugged, so Robert took Marc immediately to the ER at Wallowa Memorial Hospital where Marc was tested for opioids; the tests came up positive for opioids.

71. Marc told his father that there was nothing he could do to stop him, so Robert called the WCSO and they sent a deputy to the ER. Deputy Carper interviewed Marc- by himself- after Robert was asked to leave the room.

72. Marc was later charged with unlawful possession of a controlled substance. He pled guilty with the promise from Youth Services that his record would be expunged after successfully completing Drug Court and a two year probationary period. His probationary period of two years was to end April 15, 2011.

73. Marc's PO was Mandy Decker from Youth Services who said at a later meeting with the Duncans that Marc had confessed in his interview with the WCSO deputy that he had been experimenting with Goodman's drugs since he was 12 years old. This was a shock to Robert. Marc started having some behavioral issues at 12 years old but Marc told his dad it was because he was being bullied at school (he was openly gay and "came out of the closet at age 12"). Marc was also starting puberty, and his grandmother Dee Duncan had been diagnosed with terminal lung cancer all about the same time. Marc would come home from his mother's after weekend visits with Goodman and was often sick. Marc would say they had stayed up really late at his mom's place while he played video games and/or they watched scary movies together. Marc also had a bad immune system so it made sense. His grades started suffering which was alarming to Duncan since Marc was a genius.

74. Also in 2005, at the age 12, Marc's mother was caught selling drugs to teens (the first of several incidents) within 1,000 feet of Enterprise High School. Duncan thought she was selling drugs to teens well before 2005 and had told police several years earlier. Robert became a "mole", secretly reporting Goodman's drug activities to local police; he probably saved lives of at least three teens who were buying methadone from Shelley. The police finally caught her in a sting operation. Goodman never figured out that Robert "narked" on her several times. There were

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

also several adults buying from Goodman but police told Robert they were only interested in her selling to kids. Marc's older brother Michael was also arrested during that incident and was incarcerated. Marc was put in to counseling after that because he was so ashamed of what his mother and brother had done.

75. Later on in 2005, Goodman  threatened  to run away  with her sons after Robert caught her giving methadone to her oldest boy Michael (Mike almost died at least twice from her giving him methadone). Duncan approached Michael and offered him help. Mike then threatened Robert with a knife because he thought Duncan would turn him in to the police (Mike was still on probation for selling drugs along with Shelley and was not even supposed to be at his mother's place).

76. Duncan had had enough and immediately filed for sole custody of Marc and won. His attorney at the custody hearing was <u>Mona Williams</u> who would later become the local District Attorney and prosecute all of Goodman's criminal cases that would follow. At that 2005 custody hearing, **Goodman <u>confessed</u> she was giving methadone to her son Michael.** It was an unforgettable moment for both plaintiff and defendant, but apparently not so much for Duncan's attorney.

77. Up until that 2005 hearing, Marc had lived with his father and Gramma Dee for 95% of the time. By the time Marc ran away to his mother's place in 2010, Marc had lived with his dad for 99% of the time because he was not allowed to see his mom for two years as a matter of his probation requirements. During his probation period, Marc got **straigh**t "**A**"s at school and was thriving. Sadly, however, he secretly felt that his father had thrown him "under the bus" by turning him in to the WCSO for drug violations. Robert would live to regret doing that as well; later in August of 2010, lives would be shattered by the illegal actions of Marc's PO -Mandy Decker- and Leigh Bednar from CPS; all done under the color of the law.

78. Marc Duncan was a genius. That statement is not parental hyperbole. He was gifted in many ways but loved his mother's drugs. Marc was probably born an addict because of his mother's addictions and was -no doubt- affected by her drugs as a nursing infant. He was given the name" Marc" by his father; "Marc" was a proud family name and he was the fourth male to be given that name. All of the Duncan

Robert J. Duncan
PO Box 393
Joseph, OR. 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

family members are loving, responsible, successful, scholarly people with no troubles with the law, ever. There are no criminals and no addicts. That would include Marc's father –Robert Duncan. Robert was valedictorian in high school as was his daughter Andrea (Marc's sister). Robert completed seven years of college earning several degrees -including an MS- with honors. Family and friends of Robert would describe him as a kind, gentle, dedicated family man and totally devoted to his children; he always puts the needs of his children before his own. **Note:** Robert has never used prescription narcotics, never tried any street drugs, does not drink alcohol, has never even tried tobacco or marijuana, and drinks only water. He suffers from chronic pain from fibromyalgia and the after effects of polio, but only uses Tylenol when it gets overwhelming. He is an excellent, ambitious, award winning worker and has never drawn an unemployment check.

79. Robert's "brother Marc" was high school salutatorian and is now a college professor; their sister Lynn has a BA in English. Both Robert and his sister are very accomplished, master photographers. Marc's step-brother Brandon (wife Sherry's son and Robert's step-son) was the sole high school valedictorian in his class of over 1,000 graduates in Georgia. He received a full-ride academic scholarship to Cornell, became a Rhodes Scholar at Oxford England, and just earned a PhD at the U of Indiana. All of the children in the family are successful, happy people. It would be safe to say that every one of the Duncan's knows how to raise children.

80. Among all of the members of the extended Duncan family, son Marc was the smartest. The rest of the family was in total awe of Marc. He taught himself to read at three and a half years old with very little help with the alphabet/ phonics from his father. By age five Marc could read and comprehend at a college level. He was also a gifted mathematician and was a musical prodigy. There was so much dexterity in his hands and so much eye-hand coordination, that he could have been the next Ben Carson. Marc could easily learn any language and was fluent in Russian and Spanish –both self-taught. His vocabulary and writing skills were amazing; he had some sort of photographic memory of everything he read. He read and typed at the speed of light. Unfortunately, because of a thirst for drugs, Marc was willing to forsake even his loving, caring family to get drugs and that was of no concern to his

Robert J. Duncan
PO Box 363
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

mother; Shelley wanted Marc as a "drug buddy" at any cost and wanted to hurt Robert.

81. Marc's mother's family background is just the opposite and includes drug addicts, criminals and school dropouts. Locally, Shelly Goodman is a well-known drug addict, criminal with an accomplished police record. Since Marc's death, Goodman submitted a written/notarized declaration to the Circuit Court regarding the matter of lying to authorities as well as other lies/slander she has used against Robert to manipulate social workers and to extort money/financial gain from Robert; she is now trying to avoid "eternal damnation" for her sins and feels she is largely responsible for Marc's use of drugs. Shelley also admitted in her declaration that she lied to Robert about her background in 1992, when they met. In that declaration, she admits that all of the lies she used against Duncan were merely empty words and that he is actually a loving, caring, and non-violent person.

82. On Friday August 6th, 2010 –a few weeks before his "graduation from drug court"- Marc ran away from home; he was still 16 years old but only a few weeks away from his 17th birthday on September 7th. After a few quick calls, it was confirmed by his PO –Mandy Decker- that this had secretly been arranged by her. Duncan told her that Marc was after drugs; Decker rebutted that notion and said she had set up safeguards to keep drugs away from Marc. Robert told Decker that she had no idea of the danger to Marc from what she had done (i.e. it was foolish), and literally begged for his sons life. Mandy scoffed at him and was extremely hostile during their conversation, dropping "f---bombs" right and left; she did not seem understanding at all. Decker was more upset that Duncan had interrupted her weekend (Robert was told by a Deputy Reed at WCSO that Decker was on call that weekend and he given Duncan her phone number). Duncan did not know why she was so rude and vicious to him. He ended the call saying "he would talk with her supervisor John Lawrence". He then sat down and wrote a scathing letter (dated 8/8/2010) to Circuit Court Judge Mendiguren (he regularly presided over the drug court proceedings) asking him to remove Decker as PO from Marc's case; he filed the letter the following Monday with the Clerk of Court. Mandy would later counter by calling CPS- as retribution towards Duncan for his 8/8/2010 letter to the judge.

Robert J. Duncan
PO Box 393
Joseph, OR  97846
phone: 541-432-0103
email: sherryn136@yahoo.com

83. About ten days later, a CPS worker named Leigh Bednar showed up at the Duncan's front door. Duncan recalls he immediately asked her when she came in "what took you so long to get here?" He followed with "you know people use you folks all the time as weapons". Robert told her that Marc was in serious danger at his mother's house because he wanted drugs. Bednar openly laughed when Robert told her that time was of the essence and "**Marc will die down there**". Her chuckling continued as he begged her for his son's life.  Bednar reiterated what Decker had told him saying Shelley's drugs would be kept at the neighbor lady's place in a locked box. Duncan told Bednar her about Shelly's criminal past of giving/selling drugs to teens and added "she was foolish to think the drugs would be kept away from Marc at his mother's". He advised her to run a criminal check on Goodman with local law enforcement. Robert also spoke about all the lies Shelley had told about him over the years to manipulate law enforcement and social workers -like Bednar- against him as well as to get sympathy. When things would "cool down", Goodman would then send both of her sons to Robert's house so she could court new lovers and "do" (i.e. binge) on more drugs. Bednar did not seem sympathetic to anything Duncan was telling her and it soon became apparent that his words were falling on deaf ears. Duncan told her Goodman has adult Munchausen (aka *factitious disorder*) and added "you folks don't stand a chance of understanding her ability to lie". Bednar responded with "no she doesn't" after which Duncan asked her "how could you possibly know that?"

84. Bednar had pencil and paper but did not seem to take many notes. She looked around the house and saw that Marc was well cared for with a closet full of new clothes, a new *Sharp* television, a nice computer-center with countless video games, a *Play Station 2*, a nice big dresser, an expensive electronic piano, and a large new bed. There was plenty of nutritious food in the cupboards and refrigerator and there was only a few unexciting prescriptions (thyroid and high blood pressure) in the master bathroom.

85. Upon her request, Duncan made Bednar a list of names that had direct knowledge of the family's history and their recent plight with Marc concerning his mother's drugs; phone numbers were included. In the following weeks, Bednar <u>did</u>

Robert J. Duncan
PO Box 393
Joseph, OR. 97846
phone: 541-432-0103
email: sherryn116@yahoo.com

not call any of the people on the list. Finally, Duncan asked his daughter-in-law Melissa Duncan to call Bednar (note: in her final report that came out ten months later, Melissa had told Bednar that "Bob is an amazing father and they all watch out or Marc"). Sherry's sister –Tracie- had moved to the area several months before Marc ran away and was temporarily living with the Duncan family while she looked for housing. Sherry (Marc's step-mother) gave Bednar Tracie's work number at Winding Water's Clinic along with Tracie's cell phone number, but Bednar never called her either.

86. As it would turn out, Melissa Duncan was the only person Bednar ever talked to from the lengthy witness list that Robert gave her; CPS continued running a "fake investigation" for the next ten months. Bednar gave the Duncan's a brochure that said an investigation would take 30-60 days (a *Google* search from the internet says the average CPS investigation takes 45 days). The brochure also said CPS was required to provide an attorney if you can't afford one. Bednar said that an attorney would be provided by CPS only in the case that there would be a hearing. The Duncan's expected the whole thing to be over in a short time and Marc would be returned home soon enough to safety.

87. A few weeks later after her first visit, Bednar again stopped by the Duncan home for a second unannounced visit. She wanted to talk to step-mother Sherry alone, so Robert waited outside on the front lawn. The visit with Sherry took several hours and as Bednar left she talked several more hours out on the front lawn with Robert. Bednar told Robert that she was ruling against them for emotional abuse of Marc. She said Robert should speak more gently to Marc because he is very sensitive. Robert told Bednar that "he has been complimented on many occasions how well he speaks to his children" and added "he speaks to Marc with great respect, constantly gives him praise, and does not speak harshly to Marc, but rather does just the opposite. They are best of friends and do everything together". Robert reiterated to her that "Marc wants to do drugs at his mother's and will say anything to get what he wants; when people want drugs they will lie or do whatever else is necessary; you should know that Leigh". Duncan demanded an attorney and a hearing. He told Bednar that CPS would lose at a hearing and they would look foolish. That would be

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone 541-432-0103
email: sherryn135@yahoo.com

her last visit with the Duncan's although she did talk to Sherry on the phone in January of 2011, and told her again she was ruling against them.

88. Not long after that, a deputy served a summons for Robert –as Marc's sole custodial parent- to appear at Marc's next Drug Court hearing because he had failed a UA which was regularly required as a part of his probation. So much for the "safe guards" promised by both Decker and Bednar; Robert had given them both fair warning that those preventative measures would not work at Goodman's because she continually overdoses (i.e. could not stop Marc in that state of mind), and the woman who they appointed as "guardian of Shelley's drugs" was probably an enabler or worse (i.e. shared some of Shelley's drugs)"; Duncan added that "it was all a ruse by Goodman and her actions almost killed her other son Michael –as well as others- on several occasions". To Duncan the notion that they could keep drugs away from Marc at his mother's place was a "no brainer"; Robert had had many years of experience dealing by Marc in her final report many months later.

89. At that Drug Court hearing, Marc was with his mother. When the time was appropriate, Robert stood up and asked Judge Mendiguren to reinstate Marc's probation requirements which meant Marc would return home where he was safe and have no contact with his mother. Duncan added that his mother "gives and sells drugs to teenagers and has gone to jail for that several times"; Mendiguren would have already known that because he had presided over every one of Goodman's criminal proceedings. At that moment, Mandy Decker leaned over and whispered to the DA Mona Williams, who immediately stood up -with this horrified look on her face- and said "we have to stop this discussion right now your honor; this is a civil matter now"! Duncan's immediate thought was "we're in Drug Court; how could this be a civil matter when Marc just failed his UA? And if this is a civil matter why did Decker help him run away?" Judge Mendiguren was visibly angered at what had just taken place and came right up out of his chair telling Robert "you have to file emergency actions immediately"! Before Duncan could respond, Marc rebutted that with "the matter was under investigation by CPS". Instead of correcting what Decker had just illegally done, DA Williams chose to protect Mandy. For this reason, Robert feels that Williams is just as complicit as Decker. Decker had colluded with Bednar

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn138@yahoo.com

as judge, jury and executioner… all under the color of the law.

90. The actions of Decker at that hearing and what was to follow involving Bednarand CPS, was an attempt by Decker to throw Duncan under the bus. Unknowingly however, she threw Marc under the bus as well. **That day Marc was given a death sentence by Mandy Decker and with the help of overzealous CPS workers, and finally, along with a series of mistakes made by the WCSO, it was carried out on 12/16/2017, when he died…as Duncan had warned them would happen. Robert's sentence was being "gang raped" by Decker and a band her malicious social activists with a strong hatred of men.** That would be followed by a conspiracy by the WCSO and the local DA's office to cover-up what happened and again deny Robert his civil rights…all under the color of the law.

91. Not too long after the botched hearing, Sherry was cleaning up Marc's room and found incriminating drug paraphernalia including insulin-type needles that he had apparently ordered from a veterinary clinic. Duncan went down to see Decker as she was just getting ready to go to lunch. They spoke for only about ten minutes and Duncan tried to give her the drug paraphernalia evidence which he had photographed digitally and put on a CD. She said it was somehow " too late", and implied that Robert had secretly planted the evidence in Marc's room. If she would have looked at the evidence, Decker would have seen that it would have been impossible for Robert to plant it in Marc's room. At that same meeting, Duncan also told her that "judges do not enforce custody in Oregon for runaways if the child turns 17-1/2 and is not in trouble with the law". This meant that if Marc went thru the rest of his probation period at his mother's house then Robert could not enforce custody and get him into rehab or take other remedial steps. Time was of the essence.

92. When the CPS report finally came out, there is a part where Decker says "Robert threatened her, threw an eraser at her and yelled at her during that short meeting". That was all a lie. The conversation at the meeting was normal and Decker's friend Amy was waiting in the hall -six feet away- talking to then Sheriff Fred Steen. Duncan would have been arrested if any loud commotion or threats would have taken place. Decker lied to CPS about that and probably gave Bednar the idea to run out the clock with their investigation (i.e. Marc would be 17-1/2 and off of

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

probation so that custody orders would not be enforced). That information may be in the digital CPS records and/or Marc's juvenile records. Plaintiff will ask for Marc's CPS and his juvenile records file as discovery progresses in this complaint. The CPS records will also show that Goodman was the person making unfounded accusations (outright lies) and/or false reports to CPS about Robert. She is listed as a defendant in both **Parts 1 and 2** of this complaint; therefore that data is absolutely necessary for Plaintiff to retrieve as discovery progresses.

93. When 60 days had expired, Duncan immediately began a series of complaint letters to the local CPS; they were directed to Theresa Fisher- Bednar's supervisor. He mostly wanted to know why this process was taking so long and wanted a hearing; Marc was in danger. Fisher could not give any explanations as to why it was taking so long and her reply was always "she did not know why". When letters didn't work, Duncan then made numerous phone calls to Fisher demanding answers and a hearing. Her only response was "we have to wait for the final report before there can be a hearing".

94. Bednar called in January of 2011, and talked to Sherry; Robert was not at home. Bednar told Sherry that "she was ruling against them". Robert wanted to know when the hearing would be so he again made a barrage of phone calls to Fisher. After making numerous requests, finally, on April 11th, 2011, the Duncan's got a copy of the Final CPS Report. It was full of misinformation and lies and seemingly was written by a sixth grader (i.e. the lack of writing skills was obvious and it was extremely hard to follow). The Duncan's sat down and responded in writing to every lie, every bit of misinformation, and every "misquote" that Bednar had made in her report. Finally, on June 7th 2011, the Duncan's received a letter from Theresa Fisher saying that **the investigation of Marc's case had ended and there was "no evidence of emotional or physical abuse by the Duncan's found"**.

95. After reading Bednar's final report in April and Fisher's letter of exoneration in June 2011, it was made clear that the entire CPS investigation had been a "sham". Bednar had done nothing after the first few weeks of her inquiry to get more information from witnesses and move things along. Their entire goal was to wait for

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

Marc's probation to end and run out the clock so there would be no hearing (where they would lose). It was all done illegally under the color of the law. They had violated their own procedural guidelines of 30-60 days, and had conspired with the Department of Youth Service to deny Robert a rightful hearing and therefore, had also denied him due process. It was "dirty work" at its finest; all done with malfeasance under the color of the law.

96. Robert had no contact with Marc during the investigation period before the June 7th 2011 dismissal letter because that would have been met with a restraining order; that was always Goodman's "MO". In Oregon, it is up to the recipient of a restraining order to pay for a challenge. Duncan had gotten a restraining order from Goodman in 2007, when they (Marc and Robert) tried to do an intervention for her; she had had 4-5 ambulance calls for opioid overdose in one month and had to be hospitalized each time. Goodman somehow misinterpreted an intervention as a threat, and filed a restraining order against Duncan making up all sorts of horrendous allegations. After consulting a local law office, the attorney told Duncan he had to challenge the order. During the hearing Goodman made one imprudent lie after another and her "*Safe Harbors*" provided lawyer finally put her head down on the table in frustration. Goodman lost, of course, and Duncan's attorney later commented "it was the worst case of lying he had seen in 26 years of practice". It was of little consolation to Robert as his attorney and court fees came to almost $10,000. **Note:** It is worth noting here that at the time of that hearing Duncan had already spent well over $250,000 on lawyers, court hearings, investigations, extortion payments to Goodman, etc., dealing with custody issues over the years trying to protect Marc from a dangerous criminal. Goodman was always able to invoke counsel from state paid agencies by making up horrific accusations. She never spent a dime of her own money while Robert spent his life savings. Finally, it is also worth noting that the *Safe Harbors* director resigned shortly after that hearing, probably largely in disgust of what had occurred.

97. After the letter of absolution from CPS, Robert immediately contacted his son and they had dinner together. Duncan immediately noticed there was something wrong with Marc's teeth; they were very grey and were obviously in distress. Robert

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

begged him to see a dentist but Marc seemed dismissive of that notion. That was disturbing to Robert because he had always made sure Marc had proper dental care. Marc turned 18 years old on September 7th, 2011, and when Robert took him out to dinner again Marc's teeth looked even worse. Robert asked if he had looked at any colleges and Marc named some obscure college back east which Duncan had never heard of. Marc assured his dad that everything –including applications- was in order and all was fine.

98. From June thru September of 2011, Robert spent many days contacting lawyers for this obvious civil rights violation case. The websites for attorney listing their specialty –that now exist on the internet- did not exist back then. He tried to enlist every attorney in Eastern Oregon, but none seemed interested or qualified. Some would ask "what are the damages" which Robert could not reply to in monetary terms. Whenever he would ask the names of qualified attorneys who they could refer him to, the reply was nearly always "look in the state directory". The directory was useless because it does not list attorney specialties among the thousands of names in Oregon. One attorney in LaGrande did refer him to a qualified law firm in Portland, but their case load was already overbooked. Many attorneys said the statute of limitations had already expired by June of 2011. Duncan feels that finding civil rights attorneys that can take on DHS and other agencies is almost impossible in eastern Oregon. It would be like hitting the lottery to find an interested attorney that would come this far from Portland. That is why these state agencies can do "whatever they want" and flagrantly violate civil rights without consequence…all under the color of the law.

99. In May of 2012, while Robert was photographing one of Marc's classmates - Trevor - (who had also been his childhood friend) - told Robert that Marc had quit school a few weeks earlier; that was right before graduation and it made no sense. Trevor said Marc's mother had gone crazy and destroyed everything in the house; Marc had to stay home with her to keep her from killing herself. The next day Robert went down to visit with then DA Mona Williams to see why all of this had gone so wrong; she said "they were all manipulated by Marc and Shelley". Initially that was true, but it was Decker and Bednar (both narcissists) who were doing most of the

Robert J. Duncan
PO Box 293
Joseph, OR 87846
phone: 541-432-0103
email: shozryn138@yahoo.com

manipulating after that. Right after his visit with DA Williams, Duncan went down to the WCSO and asked then Sheriff Fred Steen if they could do a welfare check on Marc; he just sneered at Duncan, shrugged his shoulders, mumbled something incoherent but really did not reply. Sheriff Steen never did that welfare check which is required by for law officers to do upon request. Later Marc said he had got a GED (Shelley told him that was just as good as a high school diploma) and he was taking on-line courses thru Western Oregon University in LaGrande.

100. In the years that followed Robert tried to help Marc pick up the pieces of his life and move forward. He was very careful not to criticize Marc so that he would open up and learn to trust. Robert incorporated Marc into his business as his photographer's assistant. Marc responded well and seemed to really enjoy helping; he was getting back his self- esteem.  Robert had also routinely used Marc for various photo shoots when Marc was younger but he always resisted back then even though Robert paid him $20 per hour. Now as an adult, money was suddenly important to Marc, but he would not leave his mother's place -even though he was very critical of her. His reasons varied from "she needed him to take care of her" to "she is threatening suicide if he leaves". Robert wrote several letters to Marc trying to get him to open up with the truth but he resisted; the truth was that he was using hard drugs at Shelley's; she has a state paid care giver to take care of her and state paid drivers to take her anywhere she heeds to go. She did not need Marc's help.

101. A few years before he died, Marc finally confessed to his father and step-mom that he had started using methamphetamine after he graduated from drug court; he would get it from a neighbor/dealer at Pineview Apartments. Duncan asked him if Decker or Bednar ever checked on him after drug court graduation and he said never. Goodman would confirm that with Duncan later on after Marc died. Decker and CPS had detached themselves from the entire fiasco they had created, and then fled the scene of their crimes…all under the color of the law.

102. One of Robert's goals from **Part 2** of this complaint is to get all of the data he can thru the process of discovery so Marc's story can be told accurately. He is adamant that this madness has to stop and must never happen again. The strong

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

bias against fathers -as well as men in general- is insane and incredibly dangerous in today's PC culture. Duncan says "it is time for men to fight back and there are a few other people in Marc's story that need to be fired before justice is complete; we've lost perhaps one of the great minds of our time -Marc Duncan; how sad for him and all of the rest of us".

103. Consistent with its organizational culture and lack of accountability DAS, DHS, CPS, the Wallowa County Department of Youth Services, the Wallowa County DA's office and Drug Court have failed to acknowledge these conflicts. The extent of these facts will hopefully be determined thru the process of discovery as this complaint progresses.

* * *

CLAIMS FOR RELIEF

I. FEDERAL CLAIMS

FIRST CLAIM FOR RELIEF: 42 USC § 981983- Deprivation of Civil Rights; 42 USC§1985- Conspiracy to interfere with Civil Rights

(All Plaintiffs- Defendants Major and Does)

**PART 1**

104. Plaintiffs incorporate by reference paragraphs 1-64 as though fully re-alleged.

105. Title 42 USC§1983 provides in relevant part that "every person who under color of any statute, ordinance, regulation, custom, or usage, subjects or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proceedings for redress".

106. Title 42 USC§1985 (2)(3) - Conspiracy to interfere with civil rights, provides in relevant part "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course if justice in any State or Territory, with intent to deny to any citizen the equal protection of the law, or

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, to equal protection of the laws".

107. Title 42 USC§1986- Action to prevent conspiracy, provides in relevant part "Every person who, having knowledge that the wrongs conspired to be done, and mentioned in the preceding section [42 USC§1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action".

108. Title 18 USC § 242- Deprivation of rights under the law, provides in relevant part that "whoever under color of any law, ordinance, regulation, or custom, willfully subject any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or nay be sentenced to death.

109. Plaintiffs can also seek relief for reasonable attorney fees, costs and disbursements, under Title 42 USC§1988(a)(b)(c), and also an award for punitive damages.

110. Many years -starting well before 12-16-2017- the Shelley Goodman residence

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

was well known as a "drug house" by law enforcement and DHS. Similarly, the Pineview Apt complex is known as a dangerous drug complex where addicts, drug criminals and drug dealers reside and/or hang out.

111. On 12-16-17, there was a 9-1-1 call at 3:30am to WCSO dispatch as Marc Duncan was dying from opioid overdose. For whatever, reason, deputies chose not to respond. His father can only theorize here, but Robert feels it was because law enforcement had become desensitized, unconcerned and lazy because Goodman had used/abused the 9-1-1 system so many times over the years (i.e. she had "cried wolf" too many times). Goodman told Duncan later that she called more than ten times that morning while she was trying to do CPR at the same time.

112. The WCSO decided to cover-up their mistake by omitting the 3:30am 9-1-1 call from the **History Log of Calls in the WCSO Incident Report: S2017204**. That is a violation 2015 ORS§165.570 (3) improper use of the Emergency Communication System is a Class A misdemeanor. Their actions  either fall under the Oregon Wrongful Death Statute ORS§30.020, or 2017§ORS 12.115 action for negligent to person or property.

113. The ME report -**SME case # 417-4822**- spoke of a 3:30am, 9-1-1 call on 12-16-2017, from Shelley Goodman's phone. Spoliation of evidence in the police report is handled under ORS§ 40.120, 40§ .135 1, and ORS§ 10.095

114. The investigating officer –Neil Rogers- did not do any follow-up investigation work and would not answer voice mail requests from the Duncan's to address questions of concern.

115. A written request for a copy of the WCSO Incident Report was made on 4-18-2018, by Robert and Sherry Duncan at the DA's office in Enterprise. They received a letter back dated 4-19-2018, saying it was available and processing would take 14days. Shelley Goodman made a written request for the incident report on 4-23-2018, and got the same letter back as Duncan did except it was signed by Rebecca Frolander, deputy DA, instead of Mona Williams.

116. Both Duncan and Goodman should have gotten copies of the incident report

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

back around the first week of May 2018. Three more request letters were sent after 14 days had passed with never a response from the DA's office which had "gone silent". Finally, they got the report around the third week of Jul y 2018, eight months after Marc's death. The 3:30am call listed in the ME Report had been deleted from the WCSO **Incident Report: S2017204.** A cover-up/conspiracy ensued.

117. From the actions of the WCSO and the DA's office it was clear that a conspiracy to deprive Robert of his civil rights was under way in an attempt to obstruct justice. That is a violation of Title 42 USC§1985 (2) (3) and §1986. These are Title 18 UCS Chapter 13 Crimes and include UCS§241- Conspiracy Against Rights, and USC§242- Deprivation of Rights Under the Color of Law. Defendants are liable to the injured party on an action for redress under 42 USC§1983 and (1988). The crimes of the DA attorneys and unknown members of the WCSO also fall under Title 18 USC§ (2)(3)(4), §1505, §1510 (a), and §1512 (b1),(b2),(A).

118. On information and belief, consistent with its organization and lack of accountability, DHS intends to continue its dangerous practices of vetting, recruitment and certifying/recertifying of HCWs in the CEP program.

119. Plaintiffs lack an adequate remedy at law. Unless enjoined, DHS's conduct will cause irreparable/damage to Plaintiffs, and DHS will continue to cause and inflict harm on other clients and client family members under the CEP program.

120. Accordingly, Plaintiffs seek necessary and declaratory and/or declaratory and/or injunctive relief including the following relief:

(a) Declare that DHS's certification/recertification of HCWs for CEPP client Shelley Goodman was unlawful/inadequate and dangerous to family member Marc Duncan, and enjoin DHS from certifying/recertifying unqualified providers that have a criminal record of drug abuse or are using dangerous non-prescription drugs to be determined by way of UA testing.

(b) Declare that DAS's 2018 investigation (by Risk Management) of Marc Duncan's death in 2017 was an inadequate sham and enjoin DAS to objectify and complete its investigation and determine DHS's legal responsibility.

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

(c) Fire any and all individuals that participated in the conspiracy, sham investigation and cover-up by CPS in 2010, and come forth with any and all information concerning the role of Mandy Decker of Youth Services and CPS workers in the 2010-2011 conspiracy to illegally deprive Robert Duncan of his civil rights and place Marc Duncan in an unsafe place at his mother's residence.

121. Robert and Sherry Duncan have suffered economic loss due to cremation and other related fees. Furthermore, Robert had spent in excess of $250,000 (his life's savings) in attorney fees, fees involving investigations of Goodman, court fees, money that was outright stolen by Goodman, and money extorted from Robert by Goodman. Plaintiff seeks to recover other economic damages in amount(s) to be proven at the trial.

122. Robert and Sherry as well as the other family members suffered non-economic injury and damage including extreme anxiety, isolation, depression, fear, severe emotional distress and psychological injury, disruption of positive personal and romantic relationships, PTSD, and loss of self-esteem. For parents, mourning does not start when your child dies from drugs. It starts when he/she start using drugs; for Plaintiffs that started in August of 2010 when Marc ran away to do drugs. It will continue for the rest of their lives and that is a gloomy proposition.

123. Plaintiffs seek non-economic as follows:

a) To the Marc D. Duncan Estate in the amount of $25,000,000

b) To Robert Duncan in the amount of $25,000,000

124. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42 USC§1988 and also seeks an award of punitive damages.

\* \* \*

## II. STATE CLAIMS

**SECOND CLAIM FOR RELIEF: Negligence and/or negligence *per se* and /or wrongful death**

**(All Plaintiffs- Defendants Major and Does)**

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

PART 1

125. Plaintiffs incorporate by reference paragraphs 1- 64, as though fully re-alleged.

126. The Oregon Wrongful Death Statute can be found in ORS § 30.020. Pursuant to the Act, when the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent may bring an action for damages, for the benefit of the decedent's surviving spouse, surviving children, surviving parents and other individuals. The WCSO had 2-1/2 hours to respond to the 9-1-1 call from Shelley Goodman and deputies could have saved him. Is that wrongful death or gross negligence? It should have taken 10-15 minutes for first responders to get there.

127. DHS is liable for its liable for its tortious acting conduct and it is vicariously liable conduct of its officers, employees and agents acting within the scope of their employment or duties.

128. The WCSO is liable for its tortious acting conduct and it is vicariously liable conduct of its officers, employees and agents acting within the scope of their employment or duties.

129. The Wallowa County Districts Attorney's Office is liable for its tortious acting conduct and it is vicariously liable conduct of its officers, employees and agents acting within the scope of their employment or duties.

130. The WCSO, DHS (CEP) and DAS had a statutory duty to protect Plaintiffs safety and bodily integrity and to protect the civil rights of Plaintiffs. They all violated several Title 18 and Title 42 USC statutes.

131. DHS was negligent and/or negligent per se in one or more of the following particulars:

a) Failing to conduct an adequate assessment of HCWs for client/recipient Shelley Goodman in their certification process in the vetting/certification process;

Robert J Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

b) Failing to adequately monitor the Goodman home, for illegal drug activities including dangerous overdosing by Goodman when there were clear signals.

c) Failing to report illegal drug activities at the Goodman residence to law enforcement which DHS is mandated to do.

132. Shelley Goodman's disregard for Marc's well-being and safety as well as her conduct -some or all of which- caused Plaintiff's bodily damage/death thru delivery of a Schedule II substances under ORS 475.752 (1b) and Title 18 USC§§§ (2)(3)(4), and §1505. She should have been thoroughly investigated after Marc's death by the WCSO.

133. DHS and their HCWs ignored these prohibited acts by Goodman and her violations of Title 18 USC§§§ 2, 3, 4, and §1505, violations and/or did not report violations to law enforcement. They are therefore accessory under Title 18 USC§ (3).

134. The WCSO, Wallowa County DA's Office, DHS, DAS, and unknown HCWs under the CEP program and Shelley Goodman, share contributory negligence which shall not bar recovery by Plaintiffs under 2017 ORS 31.600.

135. Liability for each defendant will be determined under 2017 ORS 31.610.

136. Robert and Sherry as well as the other family members suffered non-economic injury and damage including extreme anxiety, need for isolation, depression, fear, severe emotional distress and psychological injury, disruption of positive personal and romantic relationships, PTSD, and loss of self-esteem. For parents, mourning does not start when your child dies from drugs. It starts when he/she start using drugs; for Plaintiffs that started in August of 2010 when Marc ran away to do drugs. It will continue for the rest of their lives and that is a gloomy proposition.

137. Plaintiffs seek non-economic as follows:

a) To the Marc D. Duncan Estate in the amount of $50,000,000

b) To Robert Duncan in the amount of $50,000,000

Robert J. Duncan
PO Box 383
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn138@yahoo.com

138. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42USC§1988 and also seeks an award of punitive damages.

139. Plaintiff seeks to recover economic damages in amount(s) to be proven at the trial.

140. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42 USC§1988 and also seeks an award of punitive damages

\* \* \*

# I. FEDERAL CLAIMS

## THIRD CLAIM FOR RELIEF 42 USC § 981983- Deprivation of Civil Rights; 42 USC§1985- Conspiracy to interfere with Civil Rights
### (All Plaintiffs- Defendants Major and Does)

**PART 2**

141. Plaintiffs incorporate by reference paragraphs 67-102 as though fully re-alleged

142. Title 42 USC§1983 provides in relevant part that "every person who under color of any statute, ordinance, regulation, custom, or usage, subjects or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proceedings for redress".

143. Title 42 USC§1985 (2)(3) - Conspiracy to interfere with civil rights,  provides in relevant part "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course if justice in any State or Territory, with intent to deny to any citizen the equal protection of the law, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, to equal protection of the laws".

144. Title 42 USC§1986- Action to prevent conspiracy, provides in relevant part "Every person who, having knowledge that the wrongs conspired to be done, and mentioned in the preceding section [42 USC§1985], are about to be committed, and

Robert J. Duncan
PO Box 393
Joseph, OR. 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action".

145. Title 18 USC§242- Deprivation of rights under the law, provides in relevant part that "whoever under color of any law, ordinance, regulation, or custom, willfully subject any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

146. In February 2009, Marc's sole custodial parent Father, Robert Duncan, turned him in to the WCSO after he caught Marc with opioids he had got from his mother. He would find out later that this had been going on since Marc was 12 years-old.

147. Marc pled guilty to possession of a controlled substance and was given a two year probation which would end on 4-15-2011. During that time he was not to have contact with his mother Shelley Goodman.

148. Things were going great after Marc was put into Drug Court; he was getting straight A's at school. But underneath his thirst for drugs was re-igniting.

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

149. In August of 2010, Marc Duncan -who was going thru Drug Court under the supervision of his PO Mandy Decker- ran away from home to do drugs at his mother's. CPS became involved at Decker's request. As it would be later found out, Marc had told Decker that his father called him a "fag" (Marc was gay). That was a lie and Marc was making up stories to justify going to his mother's. He felt Robert had thrown him under the bus by turning him in to authorities and he wanted to do drugs at his mother's.

150. PO Mandy Decker, DA Williams and CPS workers conspired together in secrecy to help Marc run away and kept their plan hidden from Marc's sole custodial parent Robert Duncan. Their illegal plan would fall under Title 42 USC§1985 (2)(3). All of them knew well that Goodman had a criminal past of selling and giving drugs to teens including her own son Michael, who nearly died from overdose on several occasions from Goodman giving him some of her methadone prescription.

151. There have been scores of ambulance calls to Goodman's various residences concerning her overdosing. There was one in 2003, for Michael Goodman, 4 hours after he came home for a furlough from an OTP in Baker City. He spent 3 days in the ICU. Note: Shelley was kicked out of Mike's OTP for trying to smuggle methadone in to Mike during a visit in Baker City. She was not allowed any visitation after that.

152. In 2008, Goodman also had given/sold some of her methadone to a young man who nearly died and she was incarcerated for that. She confessed in a custody hearing in 2005 that she was giving her methadone to her son Michael. Mona Williams was Duncan's attorney at that hearing, became the new DA soon after that, and was the prosecutor of all of Goodman's criminal proceedings that followed.

153. In September 2010, Marc failed his next UA at Drug Court. He should have been removed immediately by CPS and put into rehab, or sent to live with one of his local family relatives, or should or put into foster care, or sent back to his stable, loving home with his father and step-mother.

154. In September 2010, Marc should have been placed in rehab by Youth

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

Services in conjunction with CPS/ DHS, after he failed his UA. When a teen is experimenting with narcotics, they are "playing with fire"; DHS and Youth Services "threw Marc into the fire".

155. CPS- under DHS- is required to investigate reports of abuse quickly and provide a quick, fair hearing under the Adoption and Safe Families Act of 1997; and mandates that the states take reasonable efforts to (1) avoid removing children from their homes, and (2) reunite families when reports are proved to be unfounded.

156. CPS violated the Child Abuse Prevention and Treatment Act of 1974 as amended by the Child Abuse Prevention Adoption and Family Services Act of 1935 by not investigating Shelley Goodman's residence where her prescription opioids are shared freely with teenagers and close friends. They should have removed Marc immediately when he failed his UA in September of 2010. His father told them that drugs were his motive and the reports of emotional abuse were nonsense. Goodman's residence was not a safe place for Marc

157. DHS is mandated by federal law to do a quick investigation of child abuse and - by their own standards- CPS should have completed their investigation in no more than 30-60 days. Instead there was no investigating whatsoever by CPS that took place at all; instead they launched a fake ('sham") investigation that took 10 month.

158. What followed was clearly a conspiracy to deny Robert a hearing under due process and a sham investigation was launched by CPS. There were clear violations of Title 42 USC§1983, Title 42 USC§1985, and most of their own state standards and procedures.

159. Plaintiffs had a right to bodily integrity and caseworker supervision, and the right to safe conditions of confinement -including protection from criminal actions of others- and adequate medical care.

160. Defendants Leigh Bednar of CPS and Mandy Decker of Youth Services had a duty to protect Plaintiffs' safety, bodily integrity and civil rights.

161. CPS is mandated to provide safe homes when children are removed from their home and do periodic safety checks.

Robert's Jordan
PO Box 393
Joseph, OR 97846
phone. *** ***-**33
email: sherryn136@yahoo.com

162. Approximately between - August 2010 thru September 2011- neither Bednar, Fisher nor Decker chose to thoroughly investigate the Goodman residence/neighborhood and/or invoke adequate preventive measures to stop Marc from accessing narcotics and other controlled substances. In this instance, those controlled drugs included Schedule II drugs, as defined under the Controlled Substances Act of 1971, including -but not necessarily limited to- Oxycodone and methamphetamine.

163. Right after he graduated from Drug Court (probably on October 2010), Marc immediately started using methamphetamine which he got from a neighbor/dealer. Goodman knew about it but did not report.  Neither Decker nor CPS ever checked on him after he  graduated  from Drug Court.  Marc's probation ended  on  April 15th, 2011.

164. Marc's illegal use of methamphetamine lasted for about a year until the dealer move away to LaGrande. He then went back to opioids. During the period Marc was still under probation (until April 15th, 2011) and up until his 18th birthday on 9-07-2011 years old, neither CPS nor Decker ever checked on him.

165. Under the provisions of its CEP program, DHS is mandated by law to report instances all types of abuse of clients including physical abuse as and stealing or withholding medication from its clients to law enforcement. Similarly CEP in required to report instances of abuse of medication such as overdose by client.

166. HCWs under the CEP program under DHS ignored drug exchange felonies which are covered under Title 42 CFR§8.12 (a), and 21USC§829. Transferring controlled substances to another person is "distribution" which is a felony.

167. Goodman's drug escapades are legendary in Wallowa County. DHS should have placed Goodman in an OPT (Opioid Treatment Program) long ago under 42 CFR§8.12(a). It must be for reasons of maintaining "job security" for DHS, law enforcement, and others to ignore Goodman's drug illegal issues. She remains a threat to the community as this continues.

168. Decker, Bednar and Fisher knew and/or deliberately overlooked the fact that

Robert J. Duncan
PO Box 393
Joseph, OR  97846
phone: 541-432-0103
email: sherryn138@yahoo.com

the Goodman residence, was a known "drug house" and the Pineview Apartments was a haven for addicts and dealers of controlled and illegal drugs. To send Marc to a "drug house" when he was after drugs was absurd.

169. **It was well known by Decker, Bednar, Fisher, DA Mona Williams and local law enforcement** that Shelley Goodman is a known criminal and had been incarcerated several times for giving/selling her opioids to minors, and had nearly killed one young man as well as her own son, Michael.

170. Decker, Bednar, Fisher, DA Williams and local law enforcement knew that Goodman had a myriad of mental/emotional issues and had been the source of OxyContin for which Marc had been getting since he was 12 years old up until the time his father turned him in to the WCSO. Marc could have been placed in a safe home with local relatives and/or probably been sent to rehab under Title I privileges of the controlled Substance Act, when he failed his UA in September of 2010.

171. Defendants knew or should have known that Goodman is routinely hospitalized for opioid overdose. Duncan estimates that Goodman has probably had over 50 ambulance rides and knows of two mercy flights for hip fractures related to falls from overdose. The WCSO deputies always precede the ambulance calls in Wallowa County.

172. Decker did not accept evidence of drug paraphernalia found by Sherry Duncan after Marc ran away and all but accused the Duncan's of planting those items in Marc's room. If she had looked at the evidence she would have known it had to be Marc's.

173. Decker had no right to declare Marc's case a civil matter after he failed a UA test in September 2011 after she helped him runaway to his mothers. Keeping their plan hidden from Robert violated his civil rights as sole custodial parent. Marc's conditions of probation should have been reinstated as Robert requested . Williams neglected her duty as DA to correct Decker in that hearing but instead chose to protect Decker. It showed poor judgement and was illegal; it was done under the color of the law by malfeasance. Williams is complicit.

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541-432-0103
email: sherryn136@yahoo.com

174. Duncan was discriminated against because of his gender by Decker, Williams and CPS /DHS which is a violation of the Civil Rights Act of 1964 and Title 42 USC§1985 (2)(3).

175. There was conspiracy to deprive Robert of his civil rights by Decker, Bednar and Fisher by contriving a scheme to run a sham investigation of Robert and run out the clock on the statutes of limitations. Robert was also denied a fair hearing, a lawyer and due process under the guidelines that oversee DHS and CPS.

176. DHS is mandated to coordinate with law enforcement and they could have easily been informed about Goodman if that were done.

177. Decker, Bednar, Fisher and Williams substantially departed from accepted professional judgement, practice, and standards, and/or acted with deliberate indifference. Their actions put Marc at risk which was obvious after his failed UA.

178. Bednar's final report says there was a joint custodial arrangement with Marc's parents. That was not true; Robert was sole custodial parent and for good reason. That report also failed to report Marc's failed UA. Her report does say "Robert told her Marc would die down at his mother's" and she laughed.

179. Bednar ignored the list of witnesses that Robert and Sherry made for her and Melissa Duncan finally called her. Melissa told Bednar that Robert is an "amazing father". That should have been reason for Bednar to reflect on what she was doing... which was foolish then followed by nothing at all. **Since when on the United States is a drug addict criminal mother better than an amazing father? Prejudice against men or anyone else because of their gender is illegal.**

180. In September 2010, after failing his UA, Marc should have been placed in an OTP by Youth Services in conjunction with CPS/ DHS. When a teen is experimenting with narcotics, they are "playing with fire"; DHS and Youth Services "threw Marc into the fire". Placing children at risk in a safe environment is mandated by the Child abuse Prevention, Adoption and Family Service Act of 1985, and Marc's safety was obviously being neglected by his mother who knew he was using Schedule II drugs but did nothing.

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn130@yahoo.com

181. DHS is also mandated by law to return children to their parents as soon as possible which means investigations are to be expedited as quickly as possible.

182. Shelley Goodman acted with deliberate indifference to Marc's recognized liberty interests and rights and/or departed substantially from accepted parental judgement, practice or standards by knowingly letting Marc do Illicit, dangerous Schedule II drugs.

183. CPS acted with deliberate indifference to Marc's liberty interests and rights and/or departed from accepted professional judgement, practice or standards in one or more of the following ways:

a) Depriving Plaintiff of his right to bodily integrity;

b) Depriving Plaintiff right to be protected from bodily harm;

c) Subjecting plaintiff to child neglect and abuse by his mother;

d) Failing to report child neglect as mandated by DHS;

e) Avoiding an interview with Shelley Goodman;

f) Failing to do mandated follow-up checks on Marc.

184. Robert has suffered economic loss in business in this small community because of slanderous rumors by DHS workers and Mandy Decker. Both Robert and Sherry have had to seek counseling and medical care starting in 2010.

185. Plaintiffs lack an adequate remedy at law. Unless enjoined, the conduct of DHS along and Youth Services will continue to cause irreparable injury/damage to Plaintiffs, and DHS and Youth Services will continue to cause and inflict harm on other families

186. Accordingly, Plaintiff seeks necessary and proper declaratory and/or injunctive relief including the following:

a) Declare that DHS's actions against Robert were unlawful;

b) Declare that DHS's investigation was a sham and enjoin DAS to objectify and

complete its investigation and determine DHS's legal responsibility;

c) Come forth with any and/all data that shows that CPS was working with Youth Services to deny Robert due process under the Constitution.

d) Fire individuals that participated in the cover-up and send said data to the Wallowa County Board of Commissioners so that Mandy Decker will be fired.

187. Robert and Sherry have also suffered economic loss due to cremation and other related fees. Furthermore, Robert had spent in excess of $250,000 (his life's savings) in attorney fees, fees involving investigations of Goodman, court fees, money that was outright stolen by Goodman, and money extorted from Robert by Goodman. Plaintiff seeks to recover economic damages in amount(s) to be proven at the trial.

188. Plaintiffs seek non- economic damages. Robert and Sherry as well as the other family members suffered non-economic damage including physical pain, extreme anxiety, depression, fear, need for isolation, severe emotional distress and psychological injury, disruption of positive personal and romantic relationships, PTSD, and loss of self-esteem. For parents, mourning does not start when your child dies from drugs. It starts when he/she start using drugs; for Plaintiffs that started in August of 2010 when Marc ran away to do drugs. It will continue for the rest of their lives and that is a gloomy proposition.

189. Plaintiffs seek non-economic as follows:

a) To the Marc D. Duncan Estate- $25,000,000

b) To Robert Duncan in the amount of- $25,000.000

.190. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42 USC§1988 and also seeks an award of punitive damages.

191. Plaintiff seeks to recover economic damages in amount(s) to be proven at the trial.

192. Liability for each defendant will be determined under 2017 ORS 31.610.

Robert J Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

193. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42 USC§1988 and also seeks an award of punitive damages.

* * *

## I. STATE CLAIMS- PART 2

**FOURTH CLAIM FOR RELIEF: Negligence and/or negligence *per se* and/or wrongful death**

**(All Plaintiffs- Defendants Major and Does)**

### PART 2

194. Plaintiffs incorporate by reference paragraphs 67-102 as though fully re-alleged.

195. DHS is liable for its tortious conduct and it is vicariously liable for their tortious conduct of its officers, employees, and agents acting within the scope of their employment or duties.

196. The Wallowa County Department of Youth Services is liable for its tortious conduct and it is vicariously liable for their tortious conduct of its officers, employees, and agents acting within the scope of their employment or duties.

197. The standards and procedures for CPS are defined in 2017 ORS § 409.185. CPS acted with deliberate indifference to Marc's liberty interests and rights and/or departed from accepted professional judgement, practice or standards in one or more of the following ways:

a) The Department did provide remedial services needed to ensure the safety of Marc. Marc should have been sent to drug rehab right after he failed his UA in September 2010 in Drug Court. Youth Services should have recommended the same.

b) CPS is mandated in (2a) of its standards and procedures that "in all cases of child abuse and neglect for which a criminal investigation is conducted, the role of law enforcement agencies is to provide a legally sound, child sensitive investigation of

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone 541.432.0103
email: sherrym136@ahoo.com

whether abuse or neglected or both have occurred and to gather other evidence and perform other responsibilities in accordance with interagency agreements.

c) In all cases of child abuse for which an investigation is conducted, the department shall provide a child's parent, guardian or caregiver with a clear written explanation of the investigation process, the court hearing process and the rights of the parent, guardian or caregiver in the abuse investigation and in the court proceedings related to the abuse investigation". Bednar did not do any of that and violated all of Duncan's right to an attorney and due process. Her investigation was a sham and took 10 months instead of 30-60 days.

198. DHS had a non-delegable duty to protect Plaintiff's safety and bodily integrity.

199. DHS had a duty to protect Marc from neglect. OAR 413-010-0180(6).

200. DHS is required to place a child with a person of good standing for care or services, as required by ORS 418.015, and ORS 1814.195.  Shelley Goodman is not a person of good standing.

201. DHS was negligent and or negligent per se by failing to induct an adequate assessment of Shelley Goodman's and the surrounding environment at Pineview Apts., as set forth in OAR 413-080-0059.

202. DHS failed to adequately monitor the Goodman home, or make face to face contacts as set forth in OAR 413-080-0059(1)(a)(c); OAR 413-080-0059 (2); and OAR 413-080-0059 (3) (a)(b)(c).

203. Negligence and/or negligence *per se* by DHS's and Youth Services was a substantial factor resulting in the cause of Plaintiff's drug use and addiction.

204. DHS provides services designed to reunite the child with his or her parent or legal guardian except when there is clear evidence that the parent or legal guardian may not protect the child's welfare (OAR 413-010-018(7). By their own admission there was no evidence of abuse at the Duncan home in their June 7th, letter. Why did it take 10 months to determine that?

205. Plaintiffs seek non- economic damages. Robert and Sherry as well as the other

Robert J. Duncan
PO Box 393
Joseph, OR 97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

family members suffered non-economic damage including physical pain, extreme anxiety, need for isolation, depression, fear, severe emotional distress and psychological injury, disruption of positive personal and romantic relationships, PTSD, and loss of self-esteem. For parents, mourning does not start when your child dies from drugs. It starts when he/she start using drugs; for Plaintiffs that started in August of 2010 when Marc ran away to do drugs. It will continue for the rest of their lives and that is a gloomy proposition.

206. Plaintiffs seek non-economic as follows:

a) To the Marc D. Duncan Estate- $50,000,000

b) To Robert Duncan in the amount of- $50,000.000

207. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42USC§1988 and also seeks an award of punitive damages.

208. Plaintiff seeks reasonable attorney fees, costs, and disbursements under 42 USC§1988 and also seeks an award of punitive damages.

* * *

## PRAYER

Plaintiffs  pray for judgement and relief in their favor and against defendants as follows:

1. On the First Claim for Relief: 42 USC**: 42 USC § 981983- Deprivation of Civil Rights; 42 USC§1985- Conspiracy to interfere with  Civil Rights,** asserted against Defendants  Major and Does, Plaintiffs seek non-economic damages as follows:  the Marc Douglass Duncan Estate, $25,000,000; Robert Duncan, $25,000,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements and punitive damages.

2. On the  Second Claim for Relief: **Negligence and/or negligence *per se* and/or wrongful Death,** asserted against Defendants Major and Does, Plaintiffs seek non-economic damages as follows: The Marc Douglass Duncan Estate,

Robert J Duncan
PO Box 393
Joseph, OR  978 46
phone: 541- 432 -0103
email: sherryn135@yahoo.com

$50,000,000: Robert Duncan, $50,000,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements and punitive damages.

3. On the Third Claim for Relief: **42 USC § 981983- Deprivation of Civil Rights; 42 USC§1985- Conspiracy to interfere with  Civil  Rights,** asserted against Defendants  Major and Does, Plaintiffs seek non-economic damages as follows: the Marc Douglass Duncan Estate, $25,000,000; Robert  Duncan, $25,000,000.Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements and punitive damages.

4. On the Fourth Claim for Relief: **Negligence  and/or  negligence  *per  se*  and/or wrongful Death,** asserted against Defendants Major and Does, Plaintiffs seek non-economic damages as follows: The Marc Douglass Duncan Estate, $50,000,000: Robert Duncan, $50,000,000. . Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements and punitive damages.

5. The following is a legal theory of how gross negligence and/or wrongful death may apply in this complaint even though the statutes of limitations have seemingly expired:

Mesothelioma is a disease that shows up some 10 or more years after exposure with a specific kind of cancer that is unique to asbestos exposure (i.e. inhaling asbestos fibers). A multi- billion dollar fund has been set up for settlements in the cases of wrongful-death suits from mesothelioma.  The descendants, parents and/or spouses must file a wrongful death complaint within three years after the death of their loved one. Similarly, drug addiction is a disease that addicts usually suffer thru for 43 years on average. Death from addiction can occur at any time in a variety of ways including overdose, kidney/liver failure, etc. The actions of DHS (CPS) and others were so careless and brazen -in so many ways- in this case, that a ***legal precedence*** should be set for wrongful death due to the illegal actions of DHS. Marc died 10 years after DHS violated their own standards and procedure in such a way that they should be liable. This should never happen again to another innocent family.

Robert J. Duncan
PO Box 3X3
Joseph, OR  97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

Plaintiffs seek further necessary or proper relief as the Court may deem equitable and just

Dated December 10th, 2019

Robert J. Duncan, Executor and Attorney *Propria Persona*

By: _____

Robert J. Duncan

55 - COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs seek further necessary or proper relief as the Court may deem equitable and just

Dated December 10th, 2019

Robert J. Duncan, Executor and Attorney *Propria Persona*

By:  ___*Robert J. Duncan*___

Robert J. Duncan

Robert J. Duncan
PO Box 393
Joseph, OR  97846
phone: 541- 432 -0103
email: sherryn136@yahoo.com

Defendants with Addresses

Wallowa County Department of Youth Services
101 South River Street
Enterprise, OR 97828

Wallowa County Sheriff's Office
104 W. Greenwood Street
Enterprise, OR 97828

Wallowa County Districts Attorney's Office
101 South River Street
Enterprise, OR 97828

Oregon Department of Human Services
500 Summer Street NE E-15
Salem, OR 97301

Oregon Department of Administrative Services
Office of the Chief Operating Officer
Executive Building
155 Cottage Street NE
Salem, OR 97301

Shelley Goodman
PO Box 723/ 304 W. Alder Street
Pineview Apts. #1
Joseph, OR 97846